UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

**FILED**

00 JUN -5 PM 2:50

U.S. ..........i COURT
N.D. OF ALABAMA

PATRICE BURRESS,                    )
                                    )
    Plaintiff,                   )
                                    )
vs.                                 )  Civil Action No. CV-98-S-2979-NE
                                    )
UNITED AUTOMOBILE, AEROSPACE        )
AND AGRICULTURAL IMPLEMENT          )
WORKERS OF AMERICA and RON          )  **ENTERED**
BRABO,                              )
                                    )  JUN  5 2000
    Defendants.                  )

### MEMORANDUM OPINION

This action is before the court on a motion for summary judgment filed by one of the defendants, the United Automobile, Aerospace and Agricultural Implement Workers of America (Doc. No. 16). Upon consideration of the motion, briefs, evidentiary submissions, and the pleadings, this court concludes it is due to be granted for the reasons set forth herein.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides, in relevant part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, "the plain language of Rule 56(c) <u>mandates</u>



the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (emphasis supplied).

The moving party bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See generally id.*; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant discharges this burden by "showing" or "pointing out" to the court there is an absence of evidence to support the non-movant's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex Corporation*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d at 593. The nonmoving party must put forth more than a "mere

2

'scintilla'" of evidence; instead, "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

In deciding whether the movant has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See generally Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel*

3

*Works v. Employers Insurance of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988).  A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the following standards in mind, the following facts either are not disputed, or are stated in a light most favorable to plaintiff.

## II. FACTUAL BACKGROUND

Plaintiff Patrice Burress, an African-American female, began employment with Daimler Chrysler Corporation at its electronics plant in Huntsville, Alabama on January 3, 1995.  Her job classification was "Technician III."  Burress thereafter joined the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW").  UAW members who worked at the Daimler Chrysler plant in Huntsville were affiliated with "UAW Local 1413."  Union

members like plaintiff were subject to the terms of a national collective bargaining agreement between Daimler Chrysler and the UAW.  Management and the union were not permitted to apply that agreement in a discriminatory fashion.  Pursuant to the agreement, a grievance procedure existed so that union members could challenge certain actions by Daimler Chrysler that allegedly violated the agreement.

Plaintiff was assigned to Department 2030 within the plant in November of 1997.  That assignment was not permanent, but only temporary:  A permanent employee within Department 2030 was attending school, and plaintiff was informed she would be transferred from the department when that employee returned to work.  Plaintiff's supervisor in Department 2030 was a Caucasian male named Gilbert Lambert.  One of the most senior employees within that department was the other defendant in this action, Ron Brabo.  Brabo held the same position as plaintiff, and had no supervisory authority over her.  Brabo also was a union member.

## A.   The Sexual Harassment

Brabo returned to Department 2030 from a leave of absence in December of 1997.  Plaintiff contends Brabo began sexually harassing her almost immediately.  She summarized the extent of Brabo's harassment in a statement dated May 4, 1998:

5

A few days after Brabo came back to work, as I was standing in front of my desk, Brabo came up behind me and placed his hands on my shoulders.  I pulled away from him.  I felt his actions were inappropriate.

At approximately the end of January 1998, as I was standing on the scales, Brabo walked up to me and said, "I like the way those jeans fit."  I walked away after he said that.

A few days later in February of 1998, Ron Brabo, Don Burnett, a white male, and Steve Kennamer, a white male, were standing behind me talking while I was at my desk sorting tags.  Brabo was talking about the fact that he has diabetes.  He said that his wife couldn't take care of him sexually.  He then stated, "If I have a problem Patrice, you'll help me out won't you?"  Both Burnett and Kennamer heard this statement.  Kennamer stated, "Ron, you shouldn't talk to her like that."  Brabo responded in a sarcastic tone, "yeah, I forgot she was a Christian."  Brabo continued talking and said, "I can't get my dick hard because of my diabetes, but maybe when I do Patrice can help me out."  He said my name particularly loud to get my attention.  Later that evening, I approached Brabo and told him I did not appreciate him talking that way to me.  Brabo did not apologize and just shrugged off my comments.

A few days later, also in February of 1998, Brabo and I were driving forklift[s] in opposite directions.  Brabo stopped to ask me a question and reached over to me and placed his hand on my upper thigh.  I picked his hand up and pushed it away and told him not to ever touch me again.

About one week later, also in February of 1998, I was standing on the weighing scales, and Steve Kennamer turned from his work space and as I was arranging the waist of my skirt, he said something to the effect of "you should gain some weight so you wouldn't have to keep pulling at your skirt."  I did not regard Kennamer's comments as offensive.  Upon hearing Kennamer's comment, Ron Brabo turned from his work area and said that "well,

hell, just let the skirt fall off; I wanted to see you
like that anyway." Because he made that comment, I
immediately walked away from the work area.

In the beginning of March 1998, Brabo approached me about
using the forklift. In a smart tone he said I didn't
need it right then because my work was not going to be
shipped right then, and that he wanted to use the fork
lift. I said I would not let him use it because I was
not finished with it. He responded, "well the damn thing
is just sitting here," and walked off angry. ... [1]

Brabo's touching of plaintiff's shoulders and upper thigh did not

cause physical injury.

Plaintiff conferred with Departmental Supervisor Gilbert

Lambert on March 2, 1998, and complained of Brabo's conduct.

Lambert immediately confronted Brabo and directed him to cease any

harassing behavior. On the evening of March 2nd, Brabo apologized

to plaintiff for his conduct as the two walked past one another.

Moreover, he never again engaged in sexually offensive statements

or conduct. Even so, Brabo thereafter demonstrated his own

personal hostility for plaintiff.

## B. Brabo's Retaliatory Conduct

"On March 10, 1998, Brabo intentionally slammed his forklift

into a stack of palates [plaintiff] had arranged, which required

---

[1] Exhibit 11 to plaintiff's deposition, attached as Exhibit G to
plaintiff's evidentiary submission in opposition to summary judgment (Doc. No.
26), at ¶¶ 2-7.

[her] to arrange them again."[2]  Plaintiff concluded Brabo acted in such a manner to retaliate against her for meeting with Lambert:

> Q.  How would you describe what was done that caused you to feel like Mr. Brabo had done something against you as a result of the incident?
>
> A.  The way we work inside the shipping area, within that immediate area, if there was something in your way of what you needed you went and asked that person if they would move their skids or you just didn't go and move someone else's freight that they had spent all morning or a couple of hours stacking.  That was just not something you did.  And it was forcefully done.
>
> Q.  And you felt like he was peeved at you somehow?
>
> A.  He was.  Yes, that is correct.
>
> Q.  Why did you feel that way?
>
> A.  Because I had gone and exposed things that were said.  And I'm sure they were embarrassing for him because they were for me.[3]

Plaintiff again met with Lambert on March 10th to discuss this most recent incident, and Lambert indicated he would talk with Brabo about his behavior.

The same day plaintiff spoke to Lambert, she also approached her union "shop steward," Skip Hicks.  He referred her complaints to the union's Civil Rights Committee.  Two members of that committee, JoAnn Johnson and Doris Bartlet, met with plaintiff on

---

[2] Exhibit 5 to plaintiff's deposition, at 2.

[3] Plaintiff's deposition at 110-11.

March 12, 1998.  Johnson informed plaintiff she would recommend to
Hicks that he file a grievance on behalf of plaintiff against <u>her</u>
<u>supervisor</u>, Gilbert Lambert, <u>not Ron Brabo</u>.  That inexplicable *non*
*sequitur* was rationalized by the following:  the grievance
procedure is utilized solely to address alleged breaches of the
collective bargaining agreement by management employees of Daimler
Chrysler; accordingly, plaintiff could not file a grievance against
Brabo, a fellow union member.

Plaintiff heard from neither Johnson nor Hicks for
approximately one week after March 12th.  During that time,
plaintiff asked Johnson on several occasions whether she had spoken
with Hicks.  Johnson claimed Hicks would not return her pages.
Hicks eventually contacted plaintiff on or about March 20, 1998,
and informed her that he disagreed with Johnson's recommendation of
filing a grievance against plaintiff's supervisor, Gilbert Lambert,
for conduct of Ron Brabo.  Plaintiff summarized the gist of that
conversation in deposition:

> Q.   When was the next time you heard from Skip
> Hicks?
>
> A.   I don't recall the exact date.  But he came
> back a couple of days after the 17th and told me that Ms.
> Johnson had spoken with him about her decision about the
> grievance and he disagreed with it.

9

> Q.   Did he say why he disagreed?
>
> A.   He said Gilbert [Lambert] was in the process of retiring in a couple of weeks and we should just basically forget about it because if we filed a grievance it wasn't going to help the situation.[4]

In its answers to interrogatories, the UAW explained the rationale behind not filing a grievance against Lambert:

> The plaintiff was advised that a grievance against Gilbert Lambert did not state a violation of the contract; and therefore, the shop steward responsible for Ms. Burress' department declined to write the grievance. ... Local 1413 has the discretion of whether or not to process a grievance. If Local 1413 believes a grievance does not state a violation of the contract, it may decline to process a grievance. The plaintiff did not voice any objection to the steward's declining to write a grievance at that time. With respect to Ron Brabo, the defendant is unaware of any request by plaintiff to file a grievance against Ron Brabo. The only grievance that plaintiff wanted to file that defendant UAW is aware of is the grievance she wanted to file against Gilbert Lambert.[5]

Hicks suggested to plaintiff that transferring her to another department would be the best way to remedy the situation.

---

[4] *Id.* at 210-11.

[5] Defendant UAW's responses and objections to plaintiff's second interrogatories, attached as Exhibit 9 to defendant's evidentiary submission in support of summary judgment (Doc. No. 20), at 3-4. The UAW states that plaintiff wanted to file a grievance against Lambert relating to the Hillary Clinton cartoon incident, discussed *infra* at pages 12-13, which occurred on March 20, 1998. The evidence reveals that plaintiff and Johnson discussed filing a grievance against Lambert prior to this date, presumably relating to plaintiff's meetings with Lambert regarding Brabo's alleged harassment. Regardless of the incident triggering plaintiff's request for the filing of a grievance against Lambert, the UAW's rationale for not doing so is consistent, *i.e.*, in its opinion, Lambert had not committed a grievable offense.

Plaintiff countered that Brabo should be transferred, because he engaged in the allegedly wrongful conduct.  She further told Hicks that she liked her position at Department 2030, and desired to remain there.  Hicks responded that Brabo could not be transferred under the terms of the collective bargaining agreement, owing to his seniority.  Plaintiff did not contest Hicks' decision not to file a grievance against Lambert, although "Article 33 of the UAW Constitution guarantees members the right, at a union meeting, to challenge the actions of the Local Union or Unit, or its officials, in a wide range of areas, including grievance handling."[6]

Plaintiff asserts that she feared bringing her complaints to the attention of Daimler Chrysler's Labor Relations department, based on certain threatening statements made to her by Hicks that the union would no longer represent her if she pursued such a course.

> Q.   Let's break that down a little bit.  You said if you went to Labor Relations you were on your own.
>
> A.   Yes, sir.
>
> Q.   Did someone make that statement to you?
>
> A.   Skip Hicks made that statement to me.
>
> Q.   When did he say this?

---

[6] Affidavit of Eunice M. Stokes, attached as Exhibit 8 to defendant UAW's evidentiary submission in support of summary judgment, at 1-2.

A.   I don't recall the exact date.  He told me --
and it might come up later after this date.  When I got
upset about no one getting back in touch with me I felt
like I had been given the run around.  They would turn
and walk in bathrooms or dodge me whichever way when they
saw me coming.  I told him I was getting frustrated with
the fact that no one was listening or doing anything
about it.  And he told me, "If you decide to go to Labor
Relations, you're on your own.  If you get over there and
they want to fire you for whatever reason, we're not
going to represent you." [7]

UAW Local 1413's plant-shop chairperson, Doug Gullock, also
became involved in plaintiff's case around March 20, 1998.
Plaintiff informed Gullock of her displeasure regarding the delay
in investigation by the Civil Rights Committee.  Gullock's initial
response to plaintiff's complaint was that "he had represented Mr.
Brabo for a number of years and he just wouldn't imagine him doing
or saying something like that."[8]   Gullock further informed
plaintiff that Department 2030 "had not had many women to work back
there and they probably didn't mean anything by what they said. ...
[I]t was just the way they were used to working with each other."[9]

Around this time, someone placed a copy of a picture of
Hillary Clinton, nude from the waist up, on plaintiff's work
station.  Plaintiff informed Hicks and Gullock of the incident.

---

[7] Plaintiff's deposition at 220-21.

[8] *Id.* at 226.

[9] *Id.* at 231.

Accordingly, Gullock and Larry Williams, the president of UAW Local 1413, talked to a number of employees who worked around plaintiff, and warned them to cease such activity.  Plaintiff did not agree with the manner in which Gullock and Williams handled the incident, however:

> Q.   Did you have a problem with Mr. Gul[l]ock and Mr. Williams warning the people in the area to not engage in this type of conduct?
>
> A.   It was told to me that they [the employees working near plaintiff] were told not to talk to me at all, period.  I had a problem with that.
>
> . . .
>
> Q.   But if someone in your department was putting pornographic material on your desk, don't you think it would be appropriate for the union officials to go and warn them not to do such a thing?
>
> A.   I think as a whole when you address an issue like that, you don't pinpoint anybody.  It could have been handled by saying, we don't have materials like this in this department.  I should not have been fingered out and said, "Don't put it on her desk."  That's just like telling a kid not to do something.[10]

On March 23, 1998, plaintiff asked Gullock to arrange a meeting with union officials and Lambert.  That meeting, held on March 24th, involved plaintiff, Gullock, Hicks, Lambert, Johnson, and Bartlet.  Plaintiff informed those persons that investigation into Brabo's harassment was taking too long, and that she was

---

[10] *Id.* at 233, 239.

13

terminating pursuit of her complaints through the union's Civil Rights Committee.   Hicks then accompanied plaintiff to Daimler Chrysler's Labor Relations department, where she restated her complaints.

Plaintiff alleges that Brabo attempted to run over her with a forklift on March 25th.   According to plaintiff, Johnson and Bartlet, who were meeting with plaintiff at the time, had to push plaintiff out of the way in order to avoid the forklift.

Plaintiff eventually lost her position at Department 2030, because she was told the permanent employee whose position she had filled was returning from school.  Plaintiff claims that individual did not return to Department 2030 until five or six months after she was moved, however.   Plaintiff did not attempt to file a grievance relating to her transfer out of Department 2030. Plaintiff remained employed by Daimler Chrysler in a different position[11] that deprived her of the right to seek overtime compensation, which she could have exercised as a "Technician III" in Department 2030.   She did not attempt to file a grievance relating to this loss of potential overtime pay.  Plaintiff remains a member of UAW Local 1413, and serves on its Women's Committee.

---

[11] Plaintiff "was moved into a job bank which was outside of the plant to work for the Salvation Army and the Boy Scouts" for approximately one year. *Id.* at 69.

She even ran for the position of Recording Secretary in the local union elections, but was defeated.

Plaintiff filed separate charges of discrimination with the EEOC against Daimler Chrysler and UAW Local 1413 on April 3, 1998. In both charges, she claimed discrimination on the basis of race and sex. Plaintiff left the "retaliation" box unchecked in each EEOC charge. After she filed those charges, plaintiff claims she was confronted by UAW Local 1413 president Larry Williams, who screamed at her and told her that "if [she] didn't stop this nonsense that [she] was going to make the plant shut down."[12]

Plaintiff's complaints to Daimler Chrysler's Labor Relations department ultimately resulted in a suspension of Brabo for thirty days without pay. The union filed a grievance on behalf of Brabo, arguing that the thirty-day suspension was excessive. A settlement was ultimately reached between the UAW and Daimler Chrysler, which reduced Brabo's suspension to fifteen days.

### III. DISCUSSION

Plaintiff commenced this action on December 1, 1998, against three defendants: Daimler Chrysler Corporation; the UAW; and Ron Brabo. On November 24, 1999, the court approved the stipulation of dismissal of Count VII (intentional infliction of emotional

---

[12] *Id.* at 248 ("I was made to feel that what I did was wrong.").

distress/outrage) entered into between plaintiff and Brabo (Doc.
Nos. 14 & 15).  The court approved the stipulation of dismissal of
all of plaintiff's claims against Daimler Chrysler on December 17,
1999 (Doc. Nos. 18 & 19).  Finally, the court approved the
stipulation of dismissal of Counts I (Title VII race
discrimination), II (race discrimination under 42 U.S.C. § 1981),
VII (intentional infliction of emotional distress/outrage), and
VIII (malicious retention) entered into between plaintiff and the
UAW on January 11, 2000 (Doc. Nos. 21 & 22).  Accordingly, the
claims pending against the UAW at this juncture include Count III
(Title VII sex discrimination) and Count V (Title VII
retaliation).[13]

As pointed out by the UAW, it is extremely difficult to
discern whether plaintiff has even stated claims against it for
Title VII sex discrimination and retaliation based on the face of
her complaint.  Rather, those counts appear to be directed solely
at Daimler Chrysler, her employer.  For example, Count III
provides, in relevant part, that

[t]his claim is brought against the defendant, Chrysler,

---

[13] Plaintiff's complaint contains no Count IV.  In addition to the above-
listed claims pending against the UAW, an assault and battery claim (Count VI)
looms against defendant Brabo.  Brabo filed no dispositive motion relating to
that claim.  The court addresses the propriety of retaining that claim *infra* at
pages 32-33.

> for the actions of it's [sic] agent, Ron Brabo.
> Plaintiff was discriminated against and harassed because
> of her sex and gender in the terms and conditions and
> privileges of her employment. Specifically the plaintiff
> was placed in a position of constantly having to reject
> Brabo's unwanted sexual advances. This included, but is
> not limited to making lewd sexual remarks toward the
> plaintiff and unwanted touching.[14]

Count V additionally claims that "[p]laintiff was retaliated

against after opposing gender and sex harassment and discrimination

by Brabo."[15]

Plaintiff's charge of discrimination against the UAW somewhat

clarifies her Title VII sex discrimination claim, however.     It

provides, in relevant part, that

> [s]ince December 1997 and continuing I have been
> subjected to harassment, sexual harassment and
> intimidation in the work place, with the last incident
> occurring on March 24, 1998. Although, I have complained
> to union about the aforementioned statement of facts the
> conditions of my employment have not been corrected.  I
> have been a member of the union since January 3, 1995.
>
> The Douglas Goulock [sic], White Union Steward, told me
> that he could not believe that the harasser had subjected
> me to adverse terms and conditions of employment.
>
> I believe that I was not adequately provided with union
> representation that has resulted in my being subjected to
> a hostile work environment and discriminated against
> because of my sex, female and race, Black, in violation
> of Title VII of the 1964 Civil Rights Act, as

---

[14] Complaint (Doc. No. 1) ¶ 23.

[15] *Id.* ¶ 33.

17

amended.[16]

As stated *supra*, the EEOC charge makes no mention of retaliatory conduct by the UAW.

The court addresses the viability of plaintiff's sex discrimination and retaliation claims below.

**A.   Title VII Sex Discrimination**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, makes it "an unlawful employment practice for a labor organization [such as the UAW] ... to exclude or expel from its membership, or otherwise to discriminate against, any individual because of his [or her] ... sex ...."   42 U.S.C. § 2000e-2(c)(1).   Plaintiff alleges the UAW violated that statutory provision by "favoring its male members over its female members in the processing of grievances."[17] Specifically, plaintiff focuses on the UAW's filing of a grievance on behalf of Brabo but not plaintiff, as well as Hicks' response to a deposition hypothetical, in which he indicated that he would file a grievance on behalf of a male union member who had been discharged based on accusations of rape of a female union member.[18]

---

[16] Exhibit 14 to plaintiff's deposition.

[17] Plaintiff's corrected brief in opposition to summary judgment (Doc. No. 35), at 12 n.1.

[18] *See* Deposition of Earl "Skip" Hicks, attached as Exhibit H to

That hypothetical question arose out of a discussion of Matthew Pearsall, another union member employed by Daimler Chrysler. Pearsall was accused of sexual harassment by female employees of Daimler Chrysler, some of whom were union members.  The company commenced discharge proceedings against Pearsall, and the union filed a grievance on his behalf.  After nine months of investigation and negotiations, Pearsall was reinstated.

Plaintiff may establish a case of disparate treatment through either direct evidence or circumstantial evidence.  Only the most blatant remarks harboring discriminatory intent constitute direct evidence. *See generally Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir. 1999).  Plaintiff concedes she has produced no direct evidence of disparate treatment.

Accordingly, this court must analyze her circumstantial evidence of sex discrimination under the burden-shifting framework originally articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under that now familiar tripartite scheme, plaintiff has

plaintiff's evidentiary submission in opposition to summary judgment, at 37-40.

the initial burden of establishing a *prima facie* case of discrimination.  If successful, the burden of production shifts to defendant, who must articulate a legitimate, nondiscriminatory reason for the challenged employment action.  If that burden is met, plaintiff must produce evidence indicating that defendant's stated reason is mere pretext for unlawful discrimination.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (noting that plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)).  Plaintiff carries the ultimate burden of showing that the defendant intentionally discriminated against her.  *See Wright*, 187 F.3d at 1292 ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

To establish a *prima facie* case of discrimination against the union regarding its grievance process, plaintiff must prove four elements:  (1) that she is a member of a protected class; (2) that

20

she was qualified to have the union represent her in a grievance process; (3) that a grievance process was in place; and (4) that similarly-situated non-protected grievance filers were treated differently. *See Thomas v. Rite Aid Corporation*, No. 93-1800, 1994 WL 597708, at *5 (E.D. Pa. 1994), *aff'd*, 68 F.3d 457 (3d Cir. 1995). While plaintiff meets the first three requisite elements, she is unable to show "that similarly situated [male] grievance filers were treated differently." *Cf. Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) ("To make a comparison of the plaintiff's treatment to that of non-[female] employees, the plaintiff must show that [s]he and the employees are similarly situated in all relevant respects. ... [I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct ....").

Plaintiff contends the union's delay in investigating her complaints regarding Brabo and ultimate decision not to file a grievance against Lambert was motivated by considerations of gender. Plaintiff buttresses that claim by emphasizing that the union filed grievances on behalf of Brabo and another male union member named Matt Pearsall. Brabo and Pearsall are not similarly-situated to plaintiff, however. Brabo faced a thirty-day

suspension for his conduct, and Pearsall faced discharge based on alleged sexual harassment.  In both cases, the union believed the sanction imposed by management was excessive.

Plaintiff, on the other hand, faced no potential sanction from Daimler Chrysler.  She summarized the intent behind her request for the filing of a grievance against Lambert in deposition:

> Q.  ... What did you expect to gain by filing a grievance against Mr. Lambert?
>
> A.  Because if I filed a grievance it was my understanding that this would be on the record.  This would not just be my word.  If this came up three weeks from now and I walked up to you, whoever my supervisor was, and said, this has already happened, what can you do about it, it would not be my word against theirs.  This is on paper.  This shows that I tried to take action and get the situation handled.[19]

This court interprets that vague response as an indication of plaintiff's displeasure with the way Lambert handled her complaints about Brabo.  The evidence demonstrates, however, that Lambert not only acted properly, but also that plaintiff chose to involve the union and its Civil Rights Committee before Lambert could take any further action.

For example, when plaintiff initially approached Lambert regarding Brabo's sexual harassment, Lambert promptly confronted Brabo to rectify the situation.  That confrontation resulted in

---

[19] Plaintiff's deposition at 212-13 (emphasis supplied).

Brabo apologizing to Lambert the same day.   Further, plaintiff suffered no more sexual harassment from Brabo after that date.   The only incidents plaintiff complained of from that point on involved alleged retaliatory behavior by Brabo.   Plaintiff reported Brabo's initial retaliatory act (when he intentionally slammed his forklift into a stack of palates plaintiff had arranged) to Lambert on March 10th.   Lambert indicated he would again talk with Brabo, but it was at this point plaintiff involved the union.

In sum, plaintiff is not similarly-situated to Brabo or Pearsall with respect to the union's duty to file grievances.   Both male comparators faced tangible adverse employment actions at the hands of Daimler Chrysler, which the union felt to be unwarranted in light of the circumstances.   Plaintiff elected not to file a grievance relating to the only allegedly adverse employment action she suffered relevant to this case, her transfer out of Department 2030.

Even if plaintiff were to establish a *prima facie* case of sex discrimination, the UAW's legitimate, nondiscriminatory reason withstands any challenge by plaintiff of pretext.   Hicks based his decision not to file a grievance against Lambert on the above facts, because they failed to show that Lambert had done anything that rose to the level of a grievable offense.   Plaintiff further

23

agreed with Hicks and Gullock that she could not file a grievance against Brabo, a fellow union member.   It was Brabo's conduct, however, that plaintiff deemed wrongful.

On the whole, plaintiff's displeasure stemmed from the length of time taken, apparently first by Lambert and then by the union and its Civil Rights Committee, to resolve the sexual harassment complaint she lodged against Brabo.  Plaintiff attempts to combine those alleged delays with certain statements made by Hicks and Gullock to manufacture a claim of sex discrimination.  On the one occasion plaintiff requested Lambert to address the problems between herself and Brabo, he promptly did so.   From the time plaintiff first brought her problems to the attention of the union to the time she terminated its investigation, a mere two weeks elapsed.  Such facts do not demonstrate calculated delay based on plaintiff's sex.

Further, the allegedly discriminatory statements made by Hicks and Gullock fail to demonstrate that those individuals took plaintiff's sex into account in opting not to file a grievance against Lambert.   Rather, Hicks and Gulock exercised their experience and discretion in concluding that plaintiff's complaints about Lambert's performance did not constitute a grievable offense. First, plaintiff finds fault with Gullock's initial reaction to her

24

allegations, which was that he found it "hard to believe" that
Brabo would engage in harassing conduct. That statement has no
correlation to the issue of whether to file a grievance against
Lambert regarding his handling of plaintiff's complaints. The same
can be said of Gullock's statement regarding the general work
atmosphere at Department 2030. *See Price Waterhouse v. Hopkins*,
490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268 (1989)
(O'Connor, J., concurring) (noting that "statements by
decisionmakers unrelated to the decision process itself ... [do
not] suffice to satisfy the plaintiff's burden"). Finally,
plaintiff emphasizes Hicks' allegedly threatening remark that the
union would no longer assist her if she took her complaints to
Daimler Chrysler's Labor Relations department. The objective
evidence refutes such a statement, in that Hicks personally
escorted plaintiff to that department once she terminated the
union's investigation. Further, the union actively participated in
the company's investigation of Brabo's conduct. In sum, even if
plaintiff were able to demonstrate she was similarly-situated to
male grievance filers like Brabo and Pearsall, she has not adduced
sufficient evidence of pretext to rebut the UAW's legitimate, non-
discriminatory reason for not filing a grievance against Lambert.
Accordingly, summary judgment is due to be granted on plaintiff's

25

Title VII sex discrimination claim.[20]

## B.    Title VII Retaliation

While plaintiff failed to state a claim for retaliation in her
EEOC charge against the union, this court concludes that such a
claim "might reasonably be expected to be considered in a diligent
investigation" of plaintiff's sex discrimination claim. *Griffin v.
Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985).  42 U.S.C. § 2000e-
3(a), in relevant part, makes it an unlawful employment practice

> for a labor organization [such as the UAW] to
> discriminate against any member thereof or applicant for
> membership, because he [or she] has opposed any practice
> made an unlawful employment practice by this subchapter,
> or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

Plaintiff contends the UAW unlawfully retaliated against her for
complaining about Brabo's alleged harassment to Gilbert Lambert,
the union and its Civil Rights Committee, and Daimler Chrysler's
Labor Relations department.   Accordingly, she proceeds under the
"opposition" clause of Title VII's anti-retaliation provision.[21]

---

[20] To the extent plaintiff asserts a sexually hostile work environment
claim against the union, it is due to be dismissed as well.  The UAW correctly
points out in brief that "the Union has no duty, under the law, to provide a
hostile-free work environment."  *See* Defendant UAW's memorandum in support of
summary judgment (Doc. No. 25), at 42-46.  That claim properly lies against
plaintiff's employer, Daimler Chrysler, who has been dismissed from the action.

[21] To the extent plaintiff claims she was retaliated against by the UAW
after filing a charge of discrimination with the EEOC, the court notes that such
a claim arises under the "participation" clause of 42 U.S.C. § 2000e-3(a).  As
discussed *infra* at pages 31-33, such a claim also fails for lack of causation.

26

Because plaintiff proffers only circumstantial evidence of retaliation, the *McDonnell-Douglas* burden-shifting framework discussed in Section III.A *supra* again applies.   To establish a *prima facie* case of unlawful retaliation, plaintiff must prove three elements:   (1) that she engaged in statutorily protected expression or activity; (2) that she suffered an adverse employment action; and (3) that a causal linkage between the protected conduct and the adverse action exists.   *See Farley v. Nationwide Mutual Insurance Company*, 197 F.3d 1322, 1336 (11th Cir. 1999); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).   When the retaliation claim is based upon the opposition clause of § 2000e-3(a), the Eleventh Circuit requires plaintiff to also demonstrate that any acts committed, or statements made, when protesting an allegedly unlawful employment practice were both subjectively and objectively reasonable; otherwise, as a matter of law, the acts or statements will not be deemed "statutorily protected."

> A plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Technologies, Carrier Transicold Division*, 103 F.3d 956, 960 (11th Cir. 1997).   However, it is insufficient for a plaintiff "to allege his belief in

this regard was honest and *bona fide*; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable." *Id.*

*Harper v. Blockbuster Entertainment Corporation*, 139 F.3d 1385, 1388 (11th Cir. 1998).[22]

With respect to the requirement of proving an adverse employment action, the Eleventh Circuit recently joined the majority of circuits in concluding that Title VII's prohibition against retaliation extends beyond ultimate employment decisions. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998); *see also Wyatt v. City of Boston*, 35 F.3d 13, 15-16 (1st Cir. 1994) (actions other than discharge held to violate Title VII anti-retaliation provision include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees"). According to the *Wideman* court:

---

[22] The Eleventh Circuit explained the policy behind this test in *Little v. United Technologies, Carrier Transicold Division*, as follows:

> A plaintiff, therefore, need not prove the underlying discriminatory conduct that he opposed was actually unlawful in order to establish a *prima facie* case and overcome a motion for summary judgment; such a requirement "[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file formal charges rather than seek conciliation of informal adjustment of grievances."

103 F.3d at 960 (quoting Sias v. City Demonstration Agency, 588 F.2d 692, 695 (9th Cir. 1978)). *Accord* Bigge v. Albertsons, Inc., 894 F.2d 1497, 1501 (11th Cir. 1990).

> Read in the light of ordinary understanding, the term "discriminate" is not limited to "ultimate employment decisions." Moreover, our plain language interpretation of 42 U.S.C. § 2000e-3(a) is consistent with Title VII's remedial purpose. Permitting employers to discriminate against an employee who files a charge of discrimination so long as the retaliatory discrimination does not constitute an ultimate employment action, could stifle employees' willingness to file charges of discrimination.

*Wideman*, 141 F.3d at 1456. *See also Gupta*, 2000 WL 633024, at *12 ("Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, ... using both a subjective and an objective standard ...." ).

Finally, the Eleventh Circuit has noted that "a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated'" in order to establish the requisite causal linkage. *Goldsmith*, 996 F.2d at 1163 (citations omitted).

Plaintiff satisfies the first two requirements. Viewing the facts in the light most favorable to plaintiff, this court concludes plaintiff harbored a "reasonable good faith belief" that she was being sexually harassed. Accordingly, she engaged in "statutorily protected activity" by complaining about Brabo's comments and touchings to various management and union officials. *See Gupta v. Florida Board of Regents*, No. 98-5392, 2000 WL 633024,

29

at *11 (11th Cir. May 17, 2000) (entertaining plaintiff's retaliation claim, because "[a]lthough the conduct [plaintiff] complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a 'reasonable good faith belief' that she was being sexually harassed").[23] The "adverse employment action" consists of plaintiff's transfer out of Department 2030, which deprived her of the ability to work overtime hours.[24] Under *Wideman* and *Wyatt*, such a transfer must be deemed disadvantageous. *See Gupta*, 2000 WL 633024, at *12 (noting that defendant's failure to give plaintiff a pay raise despite an above satisfactory evaluation and its denial of an extension on plaintiff's tenure clock constitute adverse employment actions).

---

[23] The facts forming the basis of the plaintiff's claim in *Gupta* are somewhat similar to those before this court. In that case, the plaintiff perceived sexual harassment from a co-worker for approximately six to seven months. Here, Brabo's harassment of plaintiff that could be deemed "sexual" in nature lasted approximately three to four months. In *Gupta*, the most serious conduct complained of by the plaintiff involved two touchings by the harasser. *See Gupta*, 2000 WL 633024, at *9 ("Of all the conduct Gupta about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once. He should not have done either of those things."). Here, Brabo allegedly touched plaintiff's shoulders once and upper thigh once. Additionally, the comment made by Brabo to plaintiff regarding her ability to help him get an erection is unrivaled in the allegations made by the plaintiff in *Gupta*.

[24] In brief, plaintiff asserts that two other retaliatory incidents are attributable to the UAW. First, she contends placement of the Hillary Clinton cartoon on her work station was retaliatory. The evidence, however, fails to indicate that a union member was responsible for such conduct. In fact, it was union officials who attempted to remedy the problem. Second, she complains that Brabo's efforts to run over her with a forklift on March 25, 2000, are somehow attributable to the union. That contention is also without merit.

The dispositive issue relating to plaintiff's retaliation claim, therefore, concerns whether she can demonstrate a causal linkage between the statutorily protected activity and the adverse employment action.  Stated differently, plaintiff must persuade this court that the UAW caused such retaliatory conduct to occur.

Plaintiff concedes in deposition that her placement in Department 2030 was temporary in nature, based on the fact that a permanent employee who normally worked there was attending school. Plaintiff contends, however, that she was transferred approximately six months prior to the permanent employee's return.  Plaintiff's inability to work overtime hours during that discrete period forms the basis of her retaliation claim.

In determining causation, the operative question is whether the UAW had the power to transfer plaintiff.  If it did, plaintiff has made out a *prima facie* case of retaliation, and this court must look to the union's legitimate, nondiscriminatory reason for transferring her.  If that power resided with Daimler Chrysler, on the other hand, plaintiff's *prima facie* case fails owing to a lack of causation.  Upon review of the evidentiary submissions in this case,[25] this court concludes plaintiff has failed to adduce

---

[25] Each party submitted portions of the collective bargaining agreement in effect between the UAW and Daimler Chrysler.  None of those portions expressly discussed the issue of transfer, however.

31

sufficient proof that the UAW caused her allegedly premature transfer out of Department 2030. Plaintiff stated in deposition that an entity known as "Manpower" is responsible for changes in job placement:

> Q. Who moved you? What supervisor or management person from Chrysler told you you were going to the job bank?
>
> A. I have no idea who makes those decisions. It comes from Manpower. I don't know who's in charge of that.[26]

The evidence indicates that Daimler Chrysler is responsible for transfers. When such transfers involve union members and possibly violate the collective bargaining agreement, the union may file a grievance on behalf of the union member. When Hicks and Gullock indicated to plaintiff that transfer of Brabo was not a possibility, they were predicting that such a decision by Daimler Chrysler would violate the collective bargaining agreement, given his seniority. Plaintiff filed no grievance relating to her transfer out of Department 2030. Her bald assertion that the union caused such a transfer is without merit, and not sufficient to survive the UAW's motion for summary judgment. Accordingly, plaintiff's Title VII retaliation claim is due to be dismissed as well.

---

[26] Plaintiff's deposition at 216.

### IV. CONCLUSION

For the foregoing reasons, defendant UAW's motion for summary judgment is due to be granted in its entirety. With plaintiff's Title VII claims due to be dismissed, the bases for this court's exercise of original jurisdiction disappear. This court, therefore, exercises its discretion and dismisses the plaintiff's remaining state law claim, assault and battery against defendant Ron Brabo, without prejudice to her right to assert it in an appropriate state court of Alabama. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if ... the district court has dismissed all claims over which it has original jurisdiction ...."); *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise supplemental jurisdiction over the remaining state-law claims.").

An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this 5th day of June, 2000.

_____
United States District Judge

34